**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| **CITY OF WHITING, INDIANA.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:14 CV 440** |
| | ) | |
| **WHITNEY, BAILEY, COX, &** | ) | |
| **MAGNANI, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>OPINION and ORDER</u>

This matter is before the court on defendant's motion for summary judgment (DE # 50) and defendant's motion to strike (DE # 72). For the reasons stated below, the motion for summary judgment will be granted in part and denied in part. The motion to strike will be denied.

I.    **BACKGROUND**[1]

Plaintiff, City of Whiting, Indiana (the "City"), is located along Lake Michigan. (DE # 29 ¶ 7.) The City undertook a project to redevelop 26 acres of waterfront property along the lake. (DE # 69-2 ¶ 3.) This was called the Whiting Lakefront Park Project (the "Project"). (DE # 29 ¶ 5.) In 2009, the City hired an engineering firm, American Structurepoint, Inc. ("Structurepoint") to be the consultant for the Project. (*Id.* ¶ 8.) This hiring was established by the terms of the Prime Agreement. (DE # 29-1.)

---

[1] In the summary that follows, the court refers only to undisputed facts, or, if there is a dispute, notes that it exists. This summary provides an overview. Additional relevant undisputed facts will be referred to in the analysis that follows.

In 2010, Structurepoint subcontracted with defendant, Whitney, Bailey, Cox & Magnani, LLC ("WBCM"), for marine engineering services on the Project. (DE # 29-2, the "Subcontract.") WBCM's services included designing a rock revetment that would be built along the lake for the purpose of shoreline protection. (*See* DE ## 29 ¶ 23; 29-1 at 16.) According to the City, the revetment failed three times: (1) October 31, 2012, (2) July 28, 2014, and (3) October 31, 2014. (DE # 51-2 at 3.) The City contends these failures resulted in damage to its property located on the site of the Project and costs to repair and reinforce the revetment itself. (*Id*. at 3–5.) Specifically, the City asserts it was forced to incur expenses related to a walking pathway, landscaping and greenery, and a gazebo. (*Id*.) There was also damage to existing trees. (DE # 69-5 at 3.) Moreover, the City says it was forced to tear down the existing "Gun Club" structure, which it had intended to convert into a restaurant. (DE ## 51-2 at 5; 69-3 at 3–5.)

In addition to the issues with the revetment, the City also contends that it authorized construction of a breakwater arm (the "breakwater") based upon a recommendation from WBCM that such a structure would decrease sedimentation and lower the cost of maintenance dredging. (DE # 29 ¶¶ 36–38.) However, the completed breakwater has not resulted in any decrease in sedimentation or any decrease in the cost of maintenance dredging, according to the City. (*Id*. ¶ 86.) It also claims WBCM failed to adequately design the breakwater, resulting in additional damages. (*Id*. ¶ 89.)

On October 30, 2014, the City and Structurepoint entered into an Assignment Agreement, whereby Structurepoint assigned the Subcontract to the City along with

"any and all rights, interests, property, claims, demands, causes of action and choses in action, arising out of contract or tort, which [Structurepoint] may have against WBCM relating to the [Subcontract] and/or the Revetment Failures." (DE # 29-3 ¶ 2.) The Assignment Agreement also grants the City "the sole and exclusive right to pursue both its own claims and the claims of [Structurepoint] against WBCM relating to the Revetment Failures and/or WBCM's breach of the [Subcontract], or negligent performance of the [Subcontract] or any other failure to perform its obligations on the [Project]. (*Id*.)

On October 30, 2014, contemporaneous with the execution of the Assignment, the City and Structurepoint also entered into an agreement titled "Common Interest Agreement and Tolling Agreement" (the "Tolling Agreement"). (DE # 69-2 at 5–13.) The Tolling Agreement stated that "nothing contained in the Assignment Agreement . . . releases [Structurepoint] of or from any duty or liability . . . to [the City] under the [Prime] Agreement" and that Structurepoint's "obligations under the [Prime] Agreement shall remain in full force and effect[.]" (DE # 69-2 ¶ L.) Structurepoint and the City then agreed to toll the statute of limitations on any potential claims one might have against the other, for a certain period of time, in order to allow the parties to achieve a "common interest" and "joint defense." (*Id*. ¶ 13.)

The City has since terminated the Tolling Agreement and has filed a separate suit against Structurepoint. (DE # 69-2 ¶ 10.) That case remained pending as of July 11, 2017. (*See id*. at ¶ 10, p. 4.)

Also on October 30, 2014, the City filed a complaint against WBCM in Lake County Superior Court in Indiana. (DE # 5.) WBCM then removed the case to this court. (DE # 1.) The City later filed an amended complaint (DE # 10) and a second amended complaint (DE # 29). The second amended complaint, filed April 20, 2016, contains the following six claims: (1) breach of contract (via assignment), (2) negligence, (3) breach of contract (third-party beneficiary), (4) breach of warranty (via assignment), (5) indemnity (via assignment), and (6) breach of contract (via assignment) (regarding the breakwater). (DE # 29 at 6–10.)

On May 12, 2017, WBCM filed its motion seeking summary judgment on all claims against it. (DE # 50.) The City responded to the motion on July 12, 2017. (DE # 69.) Along with its response brief, the City attached a copy of the Tolling Agreement. (DE # 69-2 at 5–13.) The City relies on the Tolling Agreement in support of its indemnity claim. (DE # 69 at 24–25.)

On April 26, 2017, WBCM filed its reply brief to the motion for summary judgment (DE # 71) and also filed a motion to strike the Tolling Agreement from the City's response (DE # 72). The City responded to the motion to strike (DE # 76), and WBCM filed a reply in support of the motion (DE # 78). Thus, both motions are fully briefed and ripe for review.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.,* 16 F.3d 832, 836 (7th Cir. 1994) (internal citations and quotation marks omitted).

The moving party bears the initial burden of demonstrating that these requirements have been met. *Carmichael v. Village of Palatine, Ill.,* 605 F.3d 451, 460 (7th Cir. 2010). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325. Once the moving party has met its burden, the non-moving party must identify specific facts establishing that there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986); *Palmer v. Marion Cty.,* 327 F.3d 588, 595 (7th Cir. 2003) (citing *Celotex,* 477 U.S. at 324). In doing so, the non-moving party cannot rest on the pleadings alone, but must present fresh proof in support of its position. *Anderson,* 477 U.S. at 248; *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir. 1994). In viewing the facts presented on a motion for summary judgment, the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Chmiel v. JC Penney Life Ins. Co.,* 158 F.3d 966 (7th Cir. 1998).

# III.    DISCUSSION

*A.    Count II: Negligence Claim*

In its motion, WBCM argues the City's negligence claim should be dismissed under the economic loss doctrine. (DE # 51 at 5.) Specifically, Indiana's "economic loss rule" precludes tort liability for purely economic loss.[2] *Indianapolis-Marion Cty. Pub. Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 727 (Ind. 2010) (hereinafter "*IMPCL*"). "Rather these losses are viewed as disappointed contractual or commercial expectations." *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 154 (Ind. 2005). This means that when a plaintiff buys an inferior product, and then that product does not perform its generally intended function, he cannot sue in tort for the product's diminution in value, incidental and consequential losses as lost profits, rental expense, or lost time. *Id.* "Economic loss" also includes "[d]amage to the product itself, including costs of its repair or reconstruction." *Id.* On the other hand, the economic loss rule does not shield a defendant from tort liability when "the defect causes personal injury or damages to property other than the product . . . itself." *IMPCL*, 929 N.E.2d at 726.

Tort claims related to construction are subject to the economic loss doctrine. *Gunkel*, 822 N.E.2d at 155. However, in that context it can be more challenging to define

---

[2] Neither party includes a choice of law analysis in its brief. However, each party predominantly cites to cases interpreting Indiana law, and Indiana—as the location of the Project—has the most significant contacts to the subject matter of the litigation. *See Am. Family Mut. Ins. Co. v. Williams*, 839 F. Supp. 579, 582 (S.D. Ind. 1993) ("When a federal court hears a case in diversity . . . it applies the choice-of-law rules of the forum state . . . [and] in contract actions, Indiana's choice of law rules require that the law of the state with the most significant contacts to the subject matter of the litigation be applied."). Therefore, the court will apply Indiana law.

the "defective product" vis-à-vis "other property" since a building or a larger construction project is not a "good" or a "product" in the traditional sense of the word. *See id.* In the case at hand, the City agrees that the economic loss doctrine applies to its negligence claim and concedes that it can only recover on that claim for damages to property other than defective product itself. (DE # 69 at 16.) But, the parties disagree as to what constitutes the "product" and, conversely, what constitutes "other property."

WBCM defines the product broadly, as the entire Project. (DE # 51 at 7.) Accordingly, it argues that damages to any aspect of the lakefront park are barred under the economic loss doctrine. On the other hand, the City notes that the Prime Agreement separates the larger Project into several uniquely numbered projects. (DE # 29-1 at 1–2, 7.) The revetment, as a form of shoreline protection, was a component of Project No. 1. (*See id.*) Since the revetment was the defective item in this case, the City argues that Project No. 1 is the relevant "product" and that anything listed under a differently numbered project should be considered other property. (DE # 69 at 17.)

In two relevant cases, the Supreme Court of Indiana has helped to clarify what constitutes a product in the construction context. In *IMPCL*, the Public Library in the City of Indianapolis brought suit against engineering subcontractors alleging that they provided defective design and inspection services during construction of an underground parking garage built as part of a renovation project of the entire library facility. 929 N.E.2d at 731. The Indiana Supreme Court explained that "the 'product' is the product purchased by the plaintiff, not the product furnished by the defendant." *Id.* There, the Library "purchased a complete renovation and expansion of all the

components of its facility as part of a single, highly-integrated transaction." *Id*. "The Library did not purchase a blueprint from the Defendants, concrete from the materials supplier, and inspection services . . . in isolation." *Id*. Since the entire library facility was the product, any damages resulting from the subcontractors' services was to the product itself, and not to other property. *Id*. at 732.

WBCM tries to distinguish *IMPCL* by saying that it only involved the construction of a single structure/building, unlike the case at hand. (DE # 69 at 17.) However, WBCM provides no legal support for this distinction between a single structure and a larger facility. What matters is what the City purchased—not its size—and, here, the City purchased an entire lakefront park—even if that park was divided into sub-projects by the Prime Agreement. Just as the defective garage in *IMPCL* was purchased as part of the greater library facility, the defective revetment in this case was purchased as an integral part of the greater lakefront project. Accordingly, the court concludes that the "product" here is the entire Project.

The other relevant decision from the Supreme Court of Indiana is *Gunkel*. In *Gunkel*, the court held consistently with *IMPCL* that the relevant "product" is the product that is purchased by the plaintiff. 822 N.E.2d at 155. But the court also made the distinction that "property acquired separately from the defective good or service is 'other property,' whether or not it is, or is intended to be, incorporated into the same physical object." *Id*. In that case, the Gunkels contracted for the construction of a home with one contractor, and then *six months later* contracted with another company for the installation of a stone façade, which ultimately failed and caused damage to the home.

*Id.* at 151. The court held that the economic loss rule precluded tort recovery for damage to the home, as it was other property as compared to the independently acquired defective product. *Id.* at 156.

In the case at hand, the defective good or service—the revetment—was not purchased separately from the rest of the Project. In fact, the City admits the revetment was a component of the Prime Agreement. (*See* DE # 69 at 6.) Any items, like the revetment, that were purchased as part of the Project are not "other property" and recovery for damages to those items is barred by the economic loss doctrine.

However, any items that the City acquired separately from the Project would be considered "other property." Based on the evidence before the court, of the items the City lists as being damaged by the revetment failures, only (1) the existing trees and (2) the existing Gun Club structure were not purchased as part of the Project (the Gun Club *renovation* is a part of the Project, but not the pre-existing building itself). (*See* DE ## 29-1 at 21; 69-3 at 3; 69-5 at 3.) Therefore, the City could potentially recover damages to those items through its negligence claim. To the extent the City alleges damages to those or any other pre-existing items[3], the negligence claim would be exempt from the economic loss doctrine. As to all other damages, the City's negligence claim is barred by the economic loss doctrine and summary judgment is appropriate.

---

[3] It is not clear from the record if the alleged damages to items such as walking pathways, landscaping and greenery, and the gazebo were damages to the pre-existing versions of those structures or if they were damages to the renovated structures that were purchased as part of the Project. (*See* DE # 51-2 at 4–5.)

B.    *Counts I, IV, and VI: Claims Based on Assignment*

In the Assignment Agreement dated October 30, 2014, Structurepoint assigned the Subcontract to the City along with "any and all rights, interests, property, claims, demands, causes of action and choses in action, arising out of contract or tort, which [Structurepoint] may have against WBCM relating to the [Subcontract] and/or the Revetment Failures." (DE # 29-3 ¶ 2.) "In construing assignment agreements, the general rules of contract interpretation apply." *Boswell v. Lyon*, 401 N.E.2d 735, 741 (Inc Ct. App. 1980). "This means that if the language of the agreement is plain and clear, its interpretation is a matter of law." *Id*. "The court will look to the contract language as expressing the intent of the parties." *Id*.

The City brings Counts I, IV, and VI, for breach of contract and breach of warranty, on the basis of the Assignment Agreement. WBCM argues that it is entitled to summary judgment on these counts because Structurepoint had no valid claims against WBCM, prior to the assignment, that it could have legally assigned to the City. (DE # 51 at 10.) An assignee acquires only those rights possessed by the assignor. *Simon Prop. Grp. L.P. v. Brandt Constr. Inc.*, 830 N.E.2d 981, 992 (Ind. Ct. App. 2005). In other words, the City cannot assert claims against WBCM that it purportedly received from Structurepoint, if Structurepoint never held such claims to begin with.

In order for Structurepoint to have had a claim against WBCM, prior to the assignment, it must have incurred some damages; yet, WBCM says the City has failed to establish any such damages exist. (*See id*. at 13.) In its response, the City still makes no effort to provide evidence of any damages incurred by Structurepoint. (*See* DE # 69

at 19.) Nevertheless, the City argues Structurepoint's damages are actually irrelevant for the purposes of Counts I, IV, and VI. (*Id.*) That is because, the City says it is not relying on the assignment of *claims*, but rather, it is relying on the assignment of *rights* and *interests*. (*Id.*) According to the City, it doesn't matter that Structurepoint potentially had no claims against WBCM, because it has its own claims against WBCM based on the rights assigned to it by Structurepoint.

Specifically, under the Subcontract, Structurepoint had the right to engineering services performed by WBCM "in a manner consistent with that degree of care and skill ordinarily exercised by members of the same profession currently practicing under similar circumstances at the same time and in the same or similar locality." (DE # 29-2 at 1.) According to the City, that right to workmanlike performance became the City's right and can form the basis of its own breach of contract and breach of warranty claims against WBCM, irrespective of Structurepoint's damages. (DE # 69 at 20.)

As stated by the Indiana Court of Appeals, "virtually all contract rights" are assignable. *Essex v. Ryan*, 446 N.E.2d 368, 374 (Ind. Ct. App. 1983). "[The] right is to be distinguished from the remedy, a cause of action, for the violation of the right." *Id.* at 374. In *Essex*, the defendant also argued that the assignor "had no cause of action [against the defendant] to assign, either in tort or in contract." *Id.* Yet, the court found that an assignment of "any and all rights" could transfer a right to workmanlike performance to the assignee. *Id.* As such, the court said the assignee was "entitled to go to trial to prove their cause of action . . . for breach of contract" against the defendant based on the assigned right. *Id.* at 375.

11

WBCM does not dispute the court's conclusion in *Essex*, but attempts to distinguish the case by pointing out that *Essex* did not involve a chain of contracts commonly found on a construction project, unlike the case at hand. (DE # 69 at 11.) WBCM also notes the City agreed to "forego" legal action against Structurepoint in exchange for the assigned rights. (DE # 69 at 11.) There was no similar agreement to forego suit in *Essex* against the assignee. However, the court does not see how these facts would have any effect on the *Essex* court's conclusion that an assignee may bring suit based on his assigned rights.

WBCM cites no case law in its attempt to distinguish *Essex* and the court sees no language in the *Essex* decision itself which would support such a distinction. Without a reason to draw a distinction, the court will follow the holding of *Essex* and will allow the City to bring suit based on any rights assigned to it in the assignment agreement.[4]

In a footnote in its reply, WBCM also argues that Structurepoint's assignment of rights should be invalidated because WBCM did not provide its consent. The consent clause in the Prime Agreement states "[n]either the client [(the City)] nor the consultant [(Structurepoint)] shall assign his interest in the agreement without the written consent of the other." (DE # 29-2 at 13.) This clause does not, on its terms, apply to WBCM, which was not a party to the Prime Agreement. Rather, WBCM's connection to the

---

[4] Although the City may bring suit based on the rights assigned to it, generally, the court reaches no conclusions as to which specific rights may support claims against WBCM. WBCM did not challenge any of the specific rights, in its briefs, and so the court need not address it at this time. The court also reaches no conclusions as to whether the assignment of rights allows the City to sue WBCM for actions that occurred before the date of the assignment. The parties did not brief that issue.

Prime Agreement comes from a clause in the Subcontract which states that WBCM "shall be obligated to the applicable provisions . . . of the [Prime Agreement]." (DE # 29-2 at 3.)

Nevertheless, WBCM does not point to any language in the agreements which would indicate that the consent clause of the Prime Agreement was intended to be one of these "applicable provisions" which would apply to WBCM. Moreover, the Subcontract purports to give additional *obligations* to WBCM, rather than to provide additional rights to WBCM. Therefore, WBCM cannot use the consent clause of the Prime Agreement to invalidate the assignment.

For the foregoing reasons, summary judgment is denied as to these claims.

C.      *Count V: Indemnity Claim*

In the Subcontract, WBCM and Structurepoint mutually agreed "to indemnify and hold each other harmless from any and all damages, liabilities or costs . . . arising from their own negligent acts, errors or omissions, or willful misconduct in the performance of their services under [the Subcontract]." (DE # 29-2 at 3.) In other words, Structurepoint was given the right to pursue a claim against WBCM for indemnification if it was ever held liable or paid damages due to WBCM's acts or omissions. After the Assignment Agreement, the City now has the sole right to pursue Structurepoint's claims against WBCM. (DE # 29-3 at 3.) Thus, in its second amended complaint, the City asserts an indemnity claim against WBCM. (DE # 29 at 9.) It alleges that "[p]ursuant to the terms of the Subcontract and the Assignment Agreement, WBCM is obligated to

indemnify and hold harmless the City for any and all damages or liabilities arising out of WBCM's performance under the Subcontract." (*Id.* ¶ 74.)

WBCM moves for summary judgment on this claim on the grounds that Structurepoint has no liability to the City, meaning there is nothing for WBCM to indemnify. (DE # 51 at 13.) Under Indiana law, the duty to indemnify is only triggered when either (1) the indemnitee pays a claim, or (2) the indemnitee's liability in an underlying claim becomes fixed and established. *Henthorne v. Legacy Healthcare, Inc.*, 764 N.E.2d 751, 758 (Ind. Ct. App. 2002) (quoting 42 C.J.S. *Indemnity* § 22 (1991)). As to the first *Henthorne* factor, WBCM asserts Structurepoint has not paid any damages for claims. (DE # 51 at 14.) The City does not dispute this. (*See* DE # 69.)

As to the second *Henthorne* factor, no liability has been established as to Structurepoint as of yet. (*See* DE # 51 at 14–15.) In addition, WBCM contends that no liability can be fixed against Structurepoint moving forward. (*Id.*) The Assignment Agreement provides that "[Structurepoint] has proposed and [the City] has consented to pursue direct legal action against WBCM to recover [the City's] loss and damage and *forego taking legal action* against [Structurepoint] as further set forth in his Agreement." (DE # 29-3 at 3 (emphasis added).) Forego legal action in this context means to waive one's right to take legal action. *See Lafayette Car Wash, Inc. v. Boes*, 282 N.E.2d 837, 839 (Ind. 1972), *r'hng denied* ("Waiver is the intentional relinquishment of a known right; an election by one to forego some advantage he might have insisted upon.") In other words, if the City truly has waived its right to pursue legal action against

Structurepoint, Structurepoint can never be found liable to the City. Without fixed liability, the indemnity claim would fail.

The City does not dispute that Structurepoint has not paid any damages or that the term "forego" means "waive." (*See* DE # 69.) Instead, the City's argument is based on the Tolling Agreement, signed by the City and Structurepoint on the same day they signed the Assignment Agreement. (*Id.* at 24.) The Tolling Agreement states that "nothing contained in the Assignment Agreement . . . releases [Structurepoint] of or from any duty or *liability* . . . to [the City] under the [Prime] Agreement" and that Structurepoint's "obligations under the [Prime] Agreement shall remain in full force and effect[.]" (DE # 69-2 ¶ L (emphasis added).) The parties also agreed to toll the statute of limitations on "the [p]arties' claims or potential causes of action against the other." (*Id.* ¶ 13.) This language implies the City intended to preserve claims against Structurepoint, rather than to waive them. This intent is also demonstrated by the City's currently pending suit against Structurepoint. (*See* 69-2 at ¶ 10, p. 4.) If the City can bring suit against Structurepoint, that means liability could become fixed in the future, and the indemnity claim would survive.

However, in its reply (DE # 71) and in a separate motion to strike (DE # 72), WBCM asks the court to disregard the Tolling Agreement. Generally, the court *would* consider the Tolling Agreement when interpreting the Assignment Agreement, as the two agreements were signed the same day. *Ruth v. First Fed. Sav. & Loan Ass'n of LaPorte Cty.*, 492 N.E.2d 1105, 1107 (Ind. Ct. App. 1986) ("[I]n the absence of anything to indicate a contrary intention, writings executed at the same time and relating to the

same transaction or subject-matter are construed together in determining the contract."). But, WBCM insists the two agreements should not be read in conjunction, in this instance, due to the Assignment Agreement's integration clause. (DE # 71 at 12–13.)

The integration clause states as follows:

> This Assignment Agreement reflects the entire agreement between the Parties with respect to the assignment of claims hereinabove described. Those statements, promises or inducements made by or on behalf of the Parties that are not contained herein shall not be binding.

(DE #29-3 ¶ 10.) The inclusion of an integration clause, WBCM argues, means the parties intended the Assignment Agreement to stand on its own as a completely integrated document that would not be bound by any other agreements, such as the Tolling Agreement.

Still, an integration clause "does not control the question of whether a writing was intended to be completely integrated." *Franklin v. White*, 493 N.E.2d 161, 166 (Ind. 1986). An integration clause is "only some evidence" of the parties' intentions. *Id*. The court should consider the integration clause, but also any other relevant evidence on the question of integration, including the Tolling Agreement itself. *See id*. at 167 ("[T]he preliminary question of integration . . . requires the court to hear all relevant evidence, parol or written.").

The City and Structurepoint are both entities experienced in business and negotiations, rather than unsophisticated parties. This level of experience means the court should give more weight to the parties' decision to include an integration clause in the Assignment Agreement, since experienced parties would, presumably, not have

16

negotiated an integration clause if they did not actually intend the agreement to be fully integrated. *See Franklin*, 493 N.E.2d at 166 ("However, where two sophisticated parties engage in extensive preliminary negotiations, an integration clause may, in fact, reflect their mutual intention to abandon preliminary negotiations in favor of a complete and final statement of the terms of their agreement."). On the other hand, the fact that the language of the Tolling Agreement directly references the Assignment Agreement and the fact it was signed the same day as the Assignment Agreement both strongly suggest that the parties intended the Tolling Agreement to carry weight as language modifying the Assignment Agreement. This apparent contradiction between the integration clause and the language of the Tolling Agreement leaves the court with an obscured view of the parties' intentions.

WBCM, in its motion to strike, seems to initially argue that this contradiction between the integration clause and the Tolling Agreement is a reason why the Tolling Agreement should be excluded as parol evidence. (*See* DE # 72.) Yet ultimately, in its reply to its own motion to strike, WBCM acknowledges that there is a way to harmonize the Tolling and Assignment Agreements, allowing them to both be read without any contradiction. (DE # 78 at 6.) According to WBCM in its reply, "[t]he purpose of the Assignment Agreement is clear: to assign Structurepoint's claims against WBCM to the City, where both the City and Structurepoint agreed that WBCM was solely to blame for the City's alleged damages, and Structurepoint's liability to the City was purely vicarious." (*Id*.) "The agreement to forego/waive legal action against Structurepoint, then, can be read to relate only to the City's claim[s] against

Structurepoint for vicarious liability arising from WBCM's alleged negligence or breaches." (*Id.*) "In this same vein, the Tolling Agreement preserves the City's rights and claims against Structurepoint—where Structurepoint is potentially liable for Structurepoint's own acts or omissions causing damage to the City." (*Id.*)

Essentially, WBCM's theory of harmonization is another way of saying the integration clause applies only partially with regards to the *assigned* claims, *i.e.*, those claims arising from WBCM's negligence or breaches. This interpretation is consistent with the language of the integration clause itself, which merely says the "Assignment Agreement reflects the entire agreement . . . *with respect to the assignment of claims*." (DE #29-3 ¶ 10 (emphasis added).) According to this partial integration theory, the integration would not apply to claims against Structurepoint based on its own acts or omissions, which is why the City would be able to reserve those claims via the Tolling Agreement, without running afoul of the Assignment Agreement's waiver provision.

WBCM's theory of harmonizing the Assignment and Tolling Agreements is consistent with all of the relevant evidence and the language of the two agreements. Therefore, the court adopts WBCM's theory of harmonization. Consequently, the court need not strike the Tolling Agreement as parol evidence.[5]

---

[5] In its motion to strike, WBCM also argues the Tolling Agreement should be excluded based on equity because WBCM has been prejudiced by the City's selective use of privilege to withhold the Tolling Agreement until it was included along with the response brief. (DE # 72 at 5–6.) However, because the court will ultimately rule in WBCM's favor on the indemnity claim, there is no prejudice against WBCM. Accordingly, the court will deny the motion (DE # 72) as moot.

Returning to the issue of indemnity, the City acknowledges that WBCM is only obligated to indemnify Structurepoint for liabilities arising out of WBCM's performance under the Subcontract. (*See* DE # 29 ¶ 74.). But, in the Assignment Agreement, the City has specifically waived its claims against Structurepoint based on WBCM's performance. It does not matter that the City reserved its other claims against Structurepoint, via the Tolling Agreement, because WBCM is not obligated to indemnify the parties for liabilities arising from those claims. Therefore, for the purposes of the second *Henthorne* factor, Structurepoint's liability will never become fixed. Thus, the City cannot support its indemnity claim and summary judgment is appropriate on the claim.

D.      *Count III: Breach of Contract Claim Based on Third-Party Beneficiary*

The City brings a breach of contract claim on the basis that it is a third-party beneficiary of the Subcontract. (DE # 29 at 8.) To enforce a claim by virtue of being a third-party beneficiary, a plaintiff must show: "(1) [a] clear intent by the actual parties to the contract to benefit the third party; (2) [a] duty imposed on one of the contracting parties in favor of the third party; and (3) [p]erformance of the contract terms is necessary to render the third party a direct benefit intended by the parties to the contract." *Lunhow v. Horn*, 760 N.E.2d 621, 628 (Ind. Ct. App. 2001) (emphasis omitted) (quoting *NN Investors Life Ins. Co. v. Crossley*, 580 N.E.2d 307, 309 (Ind. Ct. App. 1991)). The controlling factor is the contracting parties' intent that the third party be a direct beneficiary. *Id.*

Regarding intent, the Subcontract states from the outset that the services performed by WBCM "shall assist [Structurepoint] under its Professional Services Agreement with City of Whiting, Indiana (Prime Agreement) for the PROJECT: Whiting Lakefront Park." (DE # 29-2 at 1 (underlining in original).) "Intent may be shown by naming a specific third party." *St. Paul Fire & Marine Ins. Co. V. Pearson Constr. Co.*, 547 N.E.2d 853, 856 (Ind. Ct. App. 1989). In *St. Paul*, the court concluded that the parties' contract demonstrated intent to benefit a third-party where that third-party was referred to by name as the party for whom the work was being done. *Id*. at 856–57. In the case at hand, the Subcontract similarly demonstrates intent to benefit the City because the City is referred to by name as the party for whom WBCM's engineering services are being performed.[6]

In addition to merely naming the City, the Subcontract purports to incorporate the entire Prime Agreement between the City and Structurepoint. (DE # 29-2 at 2, ¶ 5.6.) The Subcontract then provides further details regarding the incorporation of the Prime Agreement, stating "[WBCM] shall be obligated to the applicable provisions (including but not limited to indemnification, insurance, dispute resolution, and ownership of documents) of Structurepoint's [Prime] Agreement with City of Whiting." (*Id*. at 3,

[6] In its reply, WBCM attempts to distinguish *St. Paul* on the basis that the contract in that case contained clear language conferring a direct benefit of a warranty to the third-party beneficiary. (DE # 71 at 5–6 (citing *St. Paul*, 547 N.E.2d at 857.).) WBCM is correct that the contract in *St. Paul* contained specific language regarding a warranty, but the Court of Appeals of Indiana made its determination as to *intent* before considering the warranty language. The court only discussed the warranty language later in its opinion, when it examined the *duty* requirement.

¶ 5.12.) Whether or not these attempts at incorporation are actually effective in assigning duties or obligations to WBCM, it certainly evinces either intent or awareness on the part of the parties that their actions would benefit the City. The Subcontract further states that "each task" performed by WBCM "will be reviewed by the Owner" (the City) at three levels of completion. (DE # 29-2 at 4, ¶ B.) Therefore, WBCM performed all of its services under the Subcontract with the knowledge that its work was for the benefit of the City and would be reviewed by the City.

Additionally, the subcontract does not contain a "no third-party beneficiary" clause. (*See* DE # 29-2.) This fact, by itself, does not prove any intent to create a third-party beneficiary. But, it also demonstrates the absence of any affirmative intent to avoid third-party beneficiary status.

For all of the preceding reasons, the court concludes the clear intent of the parties was to benefit the City through the Subcontract.

For the second factor, the City must demonstrate the Subcontract placed a duty on one of the contracting parties, in the City's favor. For one, the Subcontract explicitly "obligated [WBCM] to the applicable provisions [of the Prime Agreement] . . . including . . . [provisions regarding] ownership of documents." (DE # 29-2 at 3, ¶ 5.12.) The provision of the Prime Agreement regarding document ownership states that final construction documents prepared by [WBCM] "shall become property of [the City]." (DE # 29-1 at 3, ¶ 10.) This is a clear and explicit duty placed on WBCM to transfer

ownership of its documents to the City.[7]

This duty, on its own, is enough to satisfy this second prong and to ultimately support a breach of contract claim based on a third-party beneficiary theory. Moreover, through the incorporation clause, WBCM is also obligated to comply with other "applicable provisions" of the Prime Agreement, with respect to the City of Whiting. (DE # 29-2, at 3, 5.12) Nevertheless, the parties have made no effort to define which additional obligations are "applicable," beyond those specifically listed. Therefore, for now, the third-party beneficiary claim will move forward without consideration of these potential additional duties.

The Subcontract also provides that WBCM has a duty to perform its services "in a manner consistent with that degree of care and skill ordinarily exercised by members of the same profession." (DE # 29-2 at 1, ¶ 2.3.) Although the City is not explicitly mentioned in the same paragraph as this duty, when it is read in the larger context of the Subcontract, the only reasonable conclusion that can be drawn is that the performance of this duty will result in a direct benefit to the City, as intended by the parties.

_____

[7] WBCM argues that Indiana courts have taken a narrow view of incorporation by reference and therefore the court should not accept the incorporation of duties originating from the Prime Agreement. (DE # 51 at 21 (citing *MPACT Constr. Grp. LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 909-10 (Ind. 2004)).) But, *MPACT* does not actually stand for the notion that Indiana takes a narrow view of incorporation by reference. *See id.* Rather, in *MPACT*, the Indiana Supreme Court simply recognizes that language incorporating contract provisions (specifically incorporating arbitration provisions, in that case) must be clear and explicit. *Id.* In that case, the incorporation language was not explicit enough, but in the case at hand the explicit incorporation of the Prime Agreement is sufficient. *See id.*; (*see also* DE # 29-2 at 2–3, ¶¶ 5.6, 5.12).

Because the City will receive the direct benefit of the work to be done, and of any additional duties (including the duty regarding ownership of documents), as intended by the parties, the third factor of the third-party beneficiary test is satisfied. *See St. Paul*, 547 N.E.2d at 857 (finding the third factor satisfied where the third-party beneficiary received a direct benefit of both the work to be done under the contract, and of an additional duty).

Since the City has provided contract language in support of each of the factors of the third-party beneficiary test, summary judgment will be denied on this claim.

## IV.    CONCLUSION

For the foregoing reasons, the court

(1) **GRANTS in part** WBCM's motion for summary judgment (DE # 50) as to Count II (negligence), as outlined above, and as to Count V (indemnity);

(2) Otherwise **DENIES in part** the motion for summary judgment (DE # 51);

(3) **DENIES** WBCM's Motion to Strike (DE # 72) **as moot**; and

(4) **ORDERS** the parties to file a joint status report regarding their willingness to engage in a settlement conference before a Magistrate Judge by April 9, 2018. A trial date will be set under a separate order.

**SO ORDERED.**

Date: March 20, 2018

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT